GIRDLER CORPORATION et al. v. AB-
BOTTS DAIRIES, Inc.

No. 9313.

District Court, E. D. Pennsylvania.
July 27, 1938.

Clair W. Fairbank and Oscar W. Jeffery, both of New York City, and William E. Sherwood, of Louisville, Ky., and Norman E. H. Deletzke, for plaintiffs.

Frank S. Busser and Busser & Harding, all of Philadelphia, Pa., and Robert Lewis Ames, George W. Hansen, M. Hudson Rathburn, and Ames, Thiess, Olson & Mecklenburger, all of Chicago, Ill., for defendant.

KIRKPATRICK, District Judge.

This is a suit in equity for patent infringement and involves a group of four patents, three of which have to do with the processing of materials, and the fourth with packaging materials in a plastic state. They are, in the order dealt with in this opinion, No. 1,783,864, December 2, 1930, to Vogt; No. 1,783,867, December 2, 1930, to Vogt; No. 1,972,253, September 4, 1934, to Vogt; and No. 1,881,106, October 4, 1932, to Vogt and Wymond. They have special application to the manufacture of ice cream, and the alleged infringement is in that field. Some of the claims in suit are for process and some for apparatus.

The two plaintiffs are, respectively, the owner of the patent and a corporation holding an exclusive license, limited to ice cream manufacturing. They will be referred to collectively as "the plaintiff." The record defendant is a user. The real defendant is Creamery Package Manufacturing Company, the manufacturer of the freezers (but not the can filler) used.

### Patent No. 1,783,864.

This is the most important of the patents in suit and covers, generally, the process alleged to be infringed. It contains 53 claims, of which 25 are for process and the remainder for apparatus. Two of the process claims (claims 3 and 5) are in suit. They are as follows (arranged):

Claim 3:

The process of treating a material consisting: (1) In continuously passing the same through a processing chamber; (2) mixing therewith a gaseous fluid; (3) agitating said material and fluid so as to cause the fluid to be enveloped in the said material; (4) maintaining said material and fluid under greater than atmospheric pressure during the mixing thereof; (5) and discharging the treated material at atmospheric pressure whereby the fluid mixed with the material will expand to larger volume.

Claim 5:

A method of processing material including: (1) Continuously passing a stream of material through a processing chamber; (2) altering the temperature thereof during said passage; (3) positively forcing a quantity of fluid into said material before the temperature thereof has become substantially changed; (4) and adjustably controlling the quantity of said fluid to

maintain a desired quantity ratio between said material and said fluid.

As applied to ice cream manufacture, the "gaseous fluid" referred to in the claims is air, the "material" is ice cream mix, and the "processing" or "altering the temperature" is freezing.

As a matter of fact, neither of these claims nor any other claim of the patent are in terms restricted to the manufacture of ice cream, and licenses have been granted under the patent for the manufacture of lard substitutes. It is, however, true that the two claims in suit, if given the meaning which the plaintiff assigns to them, would be of little if any value in the manufacture of anything but ice cream. This fact of course would not prevent a prior patent for processing lard from anticipating, but it has a bearing when it comes to construing the claims as against such prior processes.

Both claims in suit call for a continuous process. This is a departure from the batch method, now generally and hitherto almost universally used by commercial manufacturers of ice cream, by which the freezer is filled with mix, emptied or nearly emptied after the freezing takes place, and then re-filled. Concededly, there were many types of continuous freezers known to the art before these patents; the continuous feature is not urged as part of the invention, and need only be considered so far as it limits the other elements of the combination.

At this point it may be well to say something about the general development of the art at the time this patent was granted. It does not seem to me that one can broadly accept the view which the plaintiff's argument suggests—that this is a case in which further progress in ice cream manufacturing had practically been halted by fundamental difficulties. It was a big, successful industry, and the large commercial plants were turning out a product which had been brought up to a very high degree of excellence. Its problems in, say 1929, are best stated in the comparative.

The increased production possible under a continuous process was not a particularly important matter. I saw batch freezers at work, and they seemed to be about as close to a continuous operation as any non-continuous process can be. The saving of time, floor space and man-power accomplished by the continuous machines has not been greatly stressed by the plaintiff. Control of the amount of overrun (See Note 1) was very accurate and a uniform product was generally obtained, though the necessity of making frequent tests by weighing small cups of ice cream drawn directly from the freezer while in operation was an inconvenience. This, however, is still done in many plants with the plaintiff's freezers, though at longer intervals.

What was generally desired was an even smoother product, a more nearly automatic control of the amount of overrun, and the ability to turn out a stiffer product without having to sacrifice a high overrun.

This last point deserves some attention. It is a fact that in order to get the desired high overrun, the product had generally been discharged at a temperature below but close to the freezing point and then taken to cold rooms for further hardening. Protracting the freezing process in this way, the plaintiff contends, resulted in the formation of larger ice crystals, and consequently the ice cream was not likely to be as smooth as if frozen quickly and discharged very cold. There may be something in this, but certainly, as has been stated, the usual commercial product was very smooth indeed, and it takes a rather expert taster to tell the difference. There is such a thing as getting ice cream too smooth (like salve or grease), and there is evidence of complaints from customers and manufacturers on that score. A definite advantage of turning out stiffer ice cream was that packages could be filled directly from the freezers, thus saving some time and labor and facilitating making bricks of mixed flavors.

Stated in very general terms, claim 3 is directed to obtaining a cold, stiff product

---

1 "Overrun" means the increase in volume of the ice cream over the volume of the mix, expressed as per cent of the volume of the mix. It depends upon the amount of air whipped into the cream. It is important to know exactly what your overrun is going to be because it determines yield and profit in relation to cost, and because it affects the texture of the product. Too high overrun makes the ice cream fluffy or frothy, too low makes it heavy and soggy. There is no standard overrun, but 90 to 100 per cent seems to be commercial practice. Whatever it is, it should always be uniform. If it is variable the customers who have become accustomed to a particular grade will have all manner of complaints—that the ice cream is getting too light or too rich, or getting soggy, or watery, or coarse, or sticky, etc.

having high overrun, by means of freezing under supreatmospheric pressure in the processing chamber. It is argued by the plaintiff that this overcomes what he described as the law of temperature-overrun relationship, namely that, in freezing at ordinary atmospheric pressure, the colder the ice cream at the point of discharge the smaller will be the overrun. Claim 5 is directed to an accurate and largely automatic control of the amount of overrun in the product of claim 3. It impliedly covers the process of claim 3 and in addition calls for mixing air with the material in adjustably controlled quantities, before freezing begins.

The foregoing is a very rough statement of what the plaintiff calls the "Vogt principle" and must be sought mainly in the plaintiff's testimony and arguments. It is not easy to find it in the patent itself, although I am willing to accept the plaintiff's contention that it is there. For all that, one can not read the specification without getting the idea that the patentee felt that the most important object of the patent was to get a smoother ice cream, and that the most important step of the process by which he got it was passing the mix rapidly through a long, narrow freezing chamber or tube in a thin layer, so as to have a large heat transfer surface acting continuously upon a small body of material. (See claims 20, 21, and 44 to 53, inclusive.) The claims in suit do not include this element. Nowhere in any of the claims nor in the specifications does the patent address itself expressly to obtaining a stiffer product without sacrificing overrun, and it apparently entirely ignores the temperature-overrun relationship.

■ However, it is well established that the mere failure of a patentee to realize all the possibilities of his invention is not fatal. Westmoreland Specialty Co. v. Hogan, 3 Cir., 167 F. 327; Crozier-Straub, Inc., v. Graham, 3 Cir., 28 F.2d 321; Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527. Therefore, whether Vogt (or, for that matter, Meisenhelter or Light or any of the earlier inventors) knew anything about temperature-overrun relationship is immaterial if they devised a process which, by the use of pressure and forced mixing of air and material, turned out a stiff product with a high overrun.

Claim 3 may be dismissed very briefly. The reasons for holding it invalid will probably be amplified in the discussion of claim 5, and it need be said here only that, in my judgment, it is fully anticipated by the Meisenhelter patent (1,113,807) and the related prior uses. In spite of the strongly pressed arguments of counsel, I am unable to see that, as applied to the ice cream field, it is anything less than a broad general claim for the process of manufacturing ice cream continuously under superatmospheric pressure in the freezing chamber. It takes too much imagination to follow the plaintiff's argument that the last step, "discharging the treated material at atmospheric pressure, whereby the fluid mixed with the material will expand to larger volume," implies what the plaintiff contends is the essence of the patent—namely the incorporation of all of the air in the mix so that the product will contain a predetermined quantity of air. If the pressure during the mixing is sufficient to incorporate some of the air in the mix during the stirring and beating in the freezer, and the whole freezing chamber is under superatmospheric pressure, it seems to me that there is bound to be expansion somewhere along the line as the product is discharged into the atmosphere.

Nor can I accept the defendant's argument that this must mean that the process calls for a sudden expansion or puffing up at the point of discharge. The claim says in effect, "When you discharge it at atmospheric pressure the material will expand." That part of it is really not a step in the process. The discharge at atmospheric pressure is what is claimed as a step, and if it takes place at a series of points along a withdrawal conduit until the product ultimately reaches atmospheric pressure it really adds very little, because every pressure process must ultimately get its product back to atmospheric pressure. Of course, if it means discharge from the end of the freezing chamber directly into atmospheric pressure that would end the matter, because the accused freezer would not infringe. At any rate there is the same expansion in the prior processes (Meisenhelter for example) as the product is being discharged.

■ I therefore hold claim 3 invalid as anticipated.

Claim 5 is a narrower claim. It does not specifically call for superatmospheric pressure during the processing of the cream in the freezing chamber, but that is implicit in it and necessarily results from the other steps as applied to an air-tight freezing chamber. If the freezing chamber were open the rest of the process would be nul-

lified and to all practical purposes inoperative. The step in the process added by claim 5 is "positively forcing a quantity of fluid into said material before the temperature thereof has become substantially changed, and adjustably controlling the quantity of said fluid to maintain a desired ratio between said material and said fluid". The important thing is the adjustable control of the amount of air in the mix. It is essential that the air be positively forced into the mix, but the requirement that this be done before cooling has begun ("before the temperature thereof has become substantially changed") appears to be less important.

Of the three main features of the claim, as the plaintiff views it, he concedes that the idea of a continuous freezer was very old, and he must concede that several prior continuous machines maintain pressure in the freezing chamber. Thus the validity of this claim depends upon whatever novelty and invention may reside in controlling the quantity of air which is incorporated into the mix during the beating and freezing.

The question to be determined thus becomes very simple. Prior to Vogt, was there disclosed or practiced a continuous method of freezing ice cream under pressure in which the amount of air incorporated into the product could be adjustably controlled by a pressure method of incorporating the air into the mix prior to freezing?

I am of the opinion that the Meisenhelter patent and the manufacture of ice cream commercially by freezers made in substantial conformance with it, fully anticipates the process of claim 5. (See Note 2.)

The Meisenhelter patent is for a machine and not a process, but if constructed and used in accordance with the specification the "Vogt process" would necessarily be followed. Thus the disclosure, even without the testimony as to its commercial operation, is sufficient to anticipate the Vogt patent.

■ Of course, I do not question the decisions cited by the plaintiff to the effect that pre-existing apparatus which may be used to carry out the process of a patent is not always anticipation. But if it is obviously

2 Inasmuch as it has been found that the Meisenhelter patent and process anticipates, it has not been necessary to discuss the Cox Patent No. 1,469,896, and the prior public uses under the Light Patent No. 1,773,912.

Unquestionably the letter of the Cox patent is just as close, if not closer, than Meisenhelter. On the other hand, it is intended for processing lard, and in the purpose and spirit of the process and the result intended is not nearly so close to the patent claims in suit.

Cox uses an inert gas and the pressure in his cylinder is primarily to keep air from getting in. While the lard is chilled in the process, the temperature change is, roughly, from 120 degrees to 40 degrees; consequently there is little or nothing by way of increased smoothness to be gained by quick chilling. Beside, lard is not eaten like ice cream, and the consumer is not particularly interested in the smoothness of the product provided it is not too lumpy. Again, lard is sold by the pound, and the precise control of the amount of air incorporated in the process is not of vital importance, though, of course, it must be known within reasonable limits when it comes to filling containers. It has no bearing on costs or in pleasing the consumer's palate. All that is necessary is to get a product of the desired stiffness with a fairly close control of the amount of air in it.

I have not undertaken to decide whether or not the Cox patent anticipates the claims in suit, although it unquestionably anticipates many of the others. Each claim defines a distinct invention. If the Cox lard process would not infringe these claims, particularly claim 5 (certainly a doubtful question), it does not anticipate.

The Light prior public uses are numerous and well established, and may or may not anticipate. I think they are not as close as those under the Meisenhelter patent, at least so far as claim 5 is concerned, for the following reasons: First, although the freezing is under some pressure, the patent itself does not even mention this as an element. Second, whatever control of overrun there is must be accomplished by very rough approximation indeed. The mix is pumped in from an outlet at the bottom of a reservoir and the air is taken in "gulps" by the suction just as in the vortex when the plug is pulled out of a wash basin. Obviously this does not lend itself to very accurate control of the air-mix ratio. The Light process may be capable of delivering a fairly stiff ice cream with a high overrun, which is what claim 3 of the Vogt patent is intended to accomplish. What it does not do, and what I doubt very much that it is capable of doing, even under expert management, is to maintain a high degree of accuracy in the amount of overrun.

designed for the purpose of carrying out the process, or if its operation necessarily involves the process, and certainly if it has actually been used for that purpose, it may be taken as anticipation.

The plaintiff's principal argument against the Meisenhelter patent as an anticipation of claim 5 is that Meisenhelter has a pump of a type which makes it impossible to force predetermined quantities of air into the mix, unless the pressure in the freezing chamber is absolutely constant. Consequently, he says, it excludes an essential element of the Vogt process. His point is that in a reciprocating pump such as the Meisenhelter patent discloses, in which the piston does not go clear to the end of the cylinder, each compression swing or stroke of the piston leaves a residuum of air in the chamber, unincorporated into the mix. The expansion of this residual air in the pump chamber governs the amount of new air which the pump will take in on the return stroke, and it, in turn, is governed by the pressure against which the pump is working. If that is not uniform, then you have no way of knowing how much air is going to be forced into the mix from stroke to stroke, and hence you can not predetermine the ratio of the air to the mix in the process chamber or the final product. The only way to do that, the plaintiff says, is to have a pump which, like the pump disclosed by the Vogt patent (and, by the way, the plaintiff does not use this in its commercial device), incorporates into the mix all of the air admitted at each suction stroke.

I agree with the plaintiff's contention to this extent only: That the pump disclosed and used by Meisenhelter does not control the amount of air incorporated in the mix with the precision of that used with the plaintiff's commercial machine, or possibly that shown in the Vogt patent. However, it does unquestionably permit control within certain limits which have been shown to be roughly effective in increasing or decreasing the amount of overrun. The air inlet part of the pump is provided with a turn-cock and the inlet passage with a check valve, the only purpose of which can be to admit more or less air into the chamber of the pump as the operator may desire. Regardless of the plaintiff's theory of the operation of the pump, I think he must agree that, at the pressures under which the freezer ordinarily operated, the opening of the valve results in the incorporation of more air into the mix, and the partial closing of it less. Though, of course, it may be that on the individual piston strokes there will be a variance, the fact is that the testimony is convincing that it could be and was used for this purpose.

Beside the foregoing, the plaintiff's whole argument depends upon variable pressure in the freezing chamber. If it is constant and not too great, there is no trouble about getting a fairly accurate control of the air forced into the mix by the pump. It does not appear that the pressure in the Meisenhelter cylinder when in operation was otherwise than reasonably constant. There was an outlet valve, but that was intended to reduce the pressure if the operator judged (there was no pressure guage) that it was building up too much. Such building up was not the result of normal operation but might be due to unintended variations in the speed or character of the mix or other factors.

In holding the claims in suit anticipated, I have accepted their scope and intent pretty much at the plaintiff's own valuation and have taken the process as based upon what the plaintiff calls the "Vogt principle", namely the obtaining of a high and accurately controlled overrun in a stiffer product than that produced under the batch methods in ordinary commercial use. The defendant argues that no such principle can be attributed to the patent, first, because it is neither claimed, disclosed nor suggested (a matter already discussed), and, second, because the prior art and file wrapper estoppels based upon it necessarily import into the claims another feature of the process, already noted, namely, quick freezing by passing the mix through the freezing chamber in a thin, confined layer or film, which feature, concededly, is not in the accused freezer.

File wrapper estoppels and file wrapper interpretation of claims arise from an effort to ascertain whether certain terms of a claim have a special, agreed, or conventional meaning, binding upon the parties to the grant, the inventor on the one hand and the government on the other. Without burdening this discussion unnecessarily, I will state that I do not think that the applicant's response to the citation by the Examiner of Meisenhelter and Beck against his patent amounts to an agreed limitation of these two claims to a thin layer freezing process. His failure to point out the "Vogt principle" may indicate that he himself did not realize that it was present. This, as has

been stated, is not fatal. The plain fact is that, though the Meisenhelter patent anticipated him at all points, he somehow managed to convince the Examiner that it did not. Whatever arguments he may have used, I do not think that it can be said that the "thin layer, quick freezing" element was what won his point.

An inordinate amount of testimony was offered relating to the commercial success of both the plaintiff's and the Meisenhelter patent. Its bearing upon the questions of invention, novelty, and the scope to be given the claims in suit may be properly considered here. It is proper to say that the plaintiff established that the freezer manufactured and sold by the licensee of the Vogt patents has been strikingly successful and bids fair to take the place of the batch freezers as replacements are made in the industry's manufacturing equipment. It is also true that the Meisenhelter machines, though sold and used with apparently satisfactory results, could not be called a commercial success.

Evidence of commercial success or the lack of it is frequently of value, but resort to it may not be had unless the question of invention or anticipation is otherwise really in doubt and then only where causes other than the invention itself can be eliminated so that one may say that the thing claimed and nothing else is what made the patent successful.

In the present case, so far as the plaintiff's business is concerned, the second of these requirements is wholly lacking. I do not question that the plaintiff's commercial machine produces a smooth, stiff ice cream with a high overrun which can be accurately controlled. But it is impossible to predicate all or any ascertainable part of this result upon the claims of the '864 patent in suit, nor, for that matter, upon any of the four patents in suit. The plaintiff's machines have numerous patent numbers upon their name plates. I cannot find any way of determining how much of the commercial success of the plaintiff is due to the patents in suit or how much to the others —for example the Boileau patent, which

has to do with a pump mechanism which may be a factor of importance in the general result.

More important than this, however, is the fact that the one outstanding feature of the plaintiff's freezer in which it is a marked departure from the Meisenhelter machine, the point most widely and insistently advertised by the plaintiff, is a feature with which neither the claims in suit nor the accused freezer have the remotest connection. I refer to the thin film, quick freezing feature which is covered by a large number of other claims and emphasized in the specification. Undoubtedly it has a great deal to do with the smoothness of the product, if the plaintiff's own testimony to the effect that quick freezing avoids the formation of large ice crystals is to be accepted. How much this feature and the advertising of it have to do with the sale of the plaintiff's freezers, no one can possibly say.

It is also entirely likely that the enormous development of the industry and the close competition arising as time went on turned attention to the desirability of improvements which, in Meisenhelter's time, were not thought sufficiently important to cause the manufacturers to beat a pathway to his door. Meisenhelter used an obsolete cooling medium. He had very little capital, did a negligible amount of advertising, sold a cheap machine which, though fairly satisfactory, had none of the structural perfection of the plaintiff's device, and he himself soon turned from manufacturing machines to selling the ice cream made by them.

For the above reasons I have largely discounted the commercial success of the plaintiff's machines and, if it made any difference, would be equally ready to discount the lack of commercial success of the Meisenhelter.

The defendant's contention that the whole patent is invalidated by unreasonable delay on the part of Vogt in disclaiming claim 23 after its award to Light in an interference, is without merit. (See Note 3.)

---

3 In fact, I suspect that, except for the natural, and, in this case, well founded presumption that the District Judge was blankly ignorant of interference procedure, very little time would have been spent upon this point by either party. At any rate, the Judge now feels sufficiently enlightened to say that there was

no necessity under the statute for a disclaimer by Vogt until June 1, 1936. Prior to that time there had been nothing against him in the Patent Office except an interlocutory ruling by the Examiner of Interferences on a motion to dissolve, unappealable and subject to reconsideration on final hearing and the produc-

Having held the patent invalid, a finding upon the infringement is not strictly necessary to the disposition of the case. However, it will probably be convenient to have a finding on this question also, so that the whole controversy may be before the appellate court. Accordingly, I make the finding that both claims 3 and 5 of the '864 patent, if valid, would be infringed by the accused freezer.

In passing on the validity of claim 3, I gave it a very broad scope, and, if that construction is correct, the defendant certainly infringes. A great deal of argument was devoted to sharply differentiating the second (mixing) step and the third (agitating) step—whether the mixing was supposed to be in the pump and the agitating in the freezer, or the mixing in the freezer and the agitating thereafter in a whipping chamber (which neither the Vogt commercial nor the accused freezer has). It would be a waste of time to follow the fine spun theories presented on this point. Two separate steps are undoubtedly intended, but there is no limitation in this claim as to where they take place or their order of performance, and nothing to prevent them being performed so that the end of the mixing step may merge with the beginning of the agitating step. Obviously, all the steps of this claim are not necessarily consecutive in the order stated, otherwise the mixing and freezing could not begin until after the material had passed through the processing chamber. I see no reason why, under this claim, the mixing of the air with the material could not take place at some point in the freezer after the agitating had begun. The claim was drawn broadly enough to cover any process which involves the incorporation of air other than that taken in by the stirring plus freezing and stirring under pressure. If valid, it would be infringed, but it seems to me so plainly invalid in view of the prior art that further discussion of infringement is unnecessary.

As pointed out, claim 5 is a narrower claim, and here the mixing must be "positively forcing" the air into the mix, and it must take place "before" the temperature thereof has become "substantially changed". It is probably my fault, but no one has yet made me understand why it is essential that the injection of air must take place before the mix begins to cool, though I can see why it would not work out if you waited until it had begun to solidify. However, it is perfectly clear that claim 5 makes the steps consecutive and puts the mixing first.

In the accused machine the air is injected after a considerable change in temperature but before the final degree of solidity has been substantially attained. If "before the temperature thereof has been substantially changed" means exactly what it says, then the defendant does not infringe. His air is forced into the mix, not in the pump outside the cylinder, but in a little chamber at the near end of the freezer formed between a baffle plate protecting the beaters and the end wall of the cylinder. It is undoubtedly quite cold in there. Even though

---

tion of new evidence. It is true that the Examiner had entered a final judgment at an earlier stage of the proceedings, but he had promptly vacated it and the whole controversy as to claim 23 was postponed until final hearing, in order that it, together with a number of other questions, could be all disposed of at one time.

Final disposition came on June 1, 1936. Light's application for a patent was then pending, and his patent had not issued. Some time before, in an opinion upon one of the earlier appeals to it in one of the several interferences involving Light, Vogt and other parties, the Board of Appeals had expressed serious doubts as to the operativeness of Light's structure. If it should turn out that Light had failed to disclose any operable structure, his claim corresponding to 23 would, in all probability, be held invalid and disallowed. And so, if the Patent Office, in passing on the validity of Light's patent, had held that Light had not invented anything at all I do not see how the former judgment of July 1, 1936, that Light and not Vogt was the first inventor of the method of claim 23, involved in the award of priority to him, could have been other than a nullity.

Under these circumstances I think it was not unreasonable for Vogt to have delayed filing his disclaimer until he knew what the Patent Office was going to do about Light's counterpart of his claim 23. This disposes of approximately five of the six months delay, and the balance of the time is not unreasonable. Of course, the rule of Ensten v. Ascher & Co., 282 U.S. 445, 51 S.Ct. 207, 75 L. Ed. 453, applies, and Triplett v. Lowell, 297 U.S. 638, 56 S.Ct. 645, 80 L.Ed. 949, has nothing to do with the case; but, applying the rule of the Ensten Case to the fullest extent, it can not be said that these facts present any unreasonable delay.

I do not see the precise importance of it, the condition can not be entirely read out of the claim. But it can (and I think should) be read "before the temperature has changed to the extent that the product has begun to solidify," and if so read, is infringed.

So far as the other elements are concerned, the defendant's process has them all, in substance. He undoubtedly can and does adjustably control the quantity of air which gets into the mix and so maintains a desired ratio of air in the mix. Although his air pump does not measure the amount of air that enters the cylinder and hence, in a sense, can be said to deliver air in unlimited quantities, it operates at a constant pressure and "the amount that goes into the defendant's cylinder is a consequence of the speed of the mix pump, the speed of the ice cream pump, and the pressure that is applied to the cylinder, so that if you increase the speed of the ice cream pump you will have room in that cylinder for more air, because you are taking the mix out more rapidly, and as you have a constant pressure of air, the air will go into that cylinder until the twenty pounds or twenty-two pounds standard pressure is secured, so that in that sense * * *" there is a measured quantity of air and a measured quantity of mix put in there. "The quantity of that compressed air that goes in there does depend on the ice cream pump speed and the mix pump speed. You always have, we will say, twenty pounds available, and whatever space there is in there is not taken up with the mix will be filled with that twenty pounds pressure of air." I am quoting from the defendant's testimony. In this connection it will be noted that the claim is not limited to controlling the air by means of delivering measured or predetermined quantities from an air pump, although that method of doing it is pointed out in the specification. A process which controls the amount of air to maintain it in the mix in the desired ratio, by means of the mix pump and the ice cream discharge pump, infringes.

Beside, even if the letter of the claim in this respect is not infringed, the principle of operation plainly is. Westinghouse v. Boyden Power-Brake Company, 170 U.S. 537, 18 S.Ct. 707, 42 L.Ed. 1136. By freezing under pressure with a controllable ratio of mix to air or air to mix, the air being forced into the mix, the defendant is able to obtain a desirably stiff product with a high overrun, which can be accurately controlled.

The defendant's argument that his process does not continuously pass a "stream" of material through the process chamber is noted and passed with the comment that it would take more than the inference to be derived from an argument of the applicant in an interference proceeding in the Patent Office, which was not accepted and which really gained nothing for the applicant, to compel him to accept what is so clearly a stream in the accused freezer as no stream. What happened in the Patent Office was that, in a three-cornered interference, the Patent Office held in accordance with Vogt's argument that the Light patent did not show a stream, but, against his argument, held that Gray and Turnbow did. Light, with his spraying and scraping action and screw conveyer, was certainly much further removed from a stream process than Gray and Turnbow, who used an ordinary converted batch freezer. The Board was convinced that Light's patent did not show a stream under any possible interpretation of the word. It seems to me that the most that the defendant can get out of all this is that Vogt is estopped to say that his claim 5 covers the kind of movement of material shown by the Light patent—a movement substantially unlike that of either Gray and Turnbow or the accused freezer. (See Light specification, page 1, lines 90–96.)

Patents No. 1,972,253 and No. 1,783,867. [7-10] These two patents may be considered together. They are both for devices associated with the means by which the finished ice cream is withdrawn from the freezing chamber. The '867 patent is for an adjustable spring-pressed valve on the outlet, by means of which the flow can be retarded to the extent desired and the pressure in the freezing cylinder correspondingly increased. The '253 patent is for a machine with a flexible conduit through which the finished ice cream can be emptied into cartons or packages. The feature of the combination for which invention is seriously claimed is that you can hold the end of the conduit or hose at the bottom of the container to be filled and gradually raise it so that you fill the container from the bottom up.

Of course these patents claim combinations in which the whole freezing process disclosed by the '864 patent constitutes the other elements. These other elements are

claimed in the broadest language and are readable upon many of the devices of the prior art. If they disclosed or were limited to structures and processes which involved the thin layer, quick freezing element, it would be necessary to consider the patentability of that feature since the validity of the claims involving it has not been passed on in this opinion. However, as the claims stand I have no hesitation in holding that the process or machine to which the allegedly new elements are added is in all cases for an unpatentable combination. This being so, I am unable to see any invention in either of the two patents.

Regardless of the question of validity, I also think that neither of the patents is infringed. The claims of both, particularly the '867 patent, are entirely functional. And the opinion of the Circuit Court of Appeals for the Third Circuit in Elevator Supplies Company v. Graham & Norton Company, 44 F.2d 354, is peculiarly applicable (page 356): "But, after all, even if the patent for a machine be a pioneer, the alleged infringer must have done something more than reach the same result. He must have reached it by substantially the same or similar means, or the rule that the function of a machine cannot be patented is of no practical value."

The point of application of this rule to the '867 patent is that, although the ice cream discharge pump of the accused freezer is in effect a pressure holdback device and accomplishes substantially the same result as the spring-pressed valve, its whole system of withdrawal of ice cream is so entirely different from that to which the patent is an adjunct that it certainly can not be said to reach the same end by the same or equivalent means. I agree with the defendant that the ice cream pump of the accused freezer forms an absolute pressure cut-off between the freezer and the conduit and itself generates the pressure necessary for forcing the ice cream through the discharge line.

As to the '253 patent the only possibility of sustaining its validity would be to confine it very closely to association with a novel structure. This the claims in suit do not do. Its history shows that it was a voluntary division of the '864 patent granted four years later and, because of the possibility of extension of the monopoly, is subject to very strict scrutiny. The theory on which it was granted seems to have been that, having invented a machine for producing stiff, high overrun ice cream, it would also involve invention to attach to the machine a well-known means of conducting stiff ice cream to containers. As to this the Examiner uttered one feeble protest before he finally succumbed and allowed the patent, which is worth repeating here. He said, "Just because the applicant has obtained a patent upon the ice cream freezer does not warrant the allowance of claims to this same freezer plus an old piece of apparatus used in conjunction with the novel freezer." He could have gone farther, and, if you strike out the word "novel" and insert the word "unpatentable" you have the situation presented by this patent.

### Patent No. 1,881,106.

This patent is for a can filler. Its appropriateness as an accessory to the Vogt freezer lies in the fact that the Vogt freezer discharges the finished ice cream in a rather stiffer condition than most of the batch process freezers. The can filling apparatus of the patent meets this condition by filling the cans or containers from the bottom up, spreading and pressing down the ice cream as it rises in the can with a substantially uniform pressure so that it will not leave unfilled voids which might otherwise happen with any fairly stiff, plastic material.

Claims 4 and 5 of the patent are in suit. Claim 4 is as follows: "A filling device, including (1) a pair of telescoping conduit sections, the terminal section having a variable drag exerted thereon by the material passing therethrough and tending to force the last mentioned section downwardly, (2) a pressure applying means at the lower end of said last mentioned section adapted to rest on the accumulated material in the receptacle and to telescope said sections and reduce said drag as the receptacle fills, and (3) yielding means tending to lift said member and said conduit section to counteract the effect of said drag."

Claim 5 is the same as to the first two elements, and the third element is as follows: "* * * and yielding means acting to lift said member and said conduit section as the material accumulates to thereby maintain said member in contact with the upper surface of said material with a substantially constant pressure."

My conclusion is that these claims are valid, that claim 4 is infringed and that claim 5 is not infringed.

The prior art is surprisingly barren of machines directed to filling containers with semiplastic material. The general idea of using telescoping tubes is old and appears as early as Strong, No. 34,379. This patent, however, is not remotely related to the process which is the function of the Vogt and Wymond patent. It is directed to filling bins with grain and the tubes are kept elevated above the rising pile of material, which is showered down. Any pressure from a plate attached to the conduit would defeat the purpose of the patent. Webjorenson, No. 653,750, has to do with filling cans with semi-fluid substances, although it does not mention ice cream. It discloses pressure from a plate upon the rising surface of the material in the can and yielding means opposed to the pressure, but it has no telescoping tubes. The only element of the patent in suit which it shows is the variable opposition to the filling pressure by a spring.

All of the elements of the '106 patent can be found separately in the prior art, but I think that it involved invention to combine them in the manner in which it has been done, and that they are functionally related in a new way.

The accused structure is almost exactly like that of the patent, with the single exception that, instead of a spring, the yielding means to lift the telescoping conduit with its pressure plate is a counterweight suspended on a cable and pulley. I agree with the defendant's contention that since the force of the counterweight is constant and since it acts against a variable (the drag force exerted by the material flowing through the tube) it will not maintain the pressure plate in contact with the upper surface of the ice cream with a substantially constant pressure. Since claim 5 is a functional element ("yielding means") other yielding means which wholly fail to perform the described function can not be held to be equivalents.

Claim 4 is broader. All that is required of the means in the third element of this claim is that it lifts the pressure plate and will "counteract the effect of the said drag." The defendant's argument for non-infringement requires that the word "counteract" in this element must be read as meaning opposition which equalizes the variable force of the drag at all times. Hence it must mean variable opposition. Hence it applies to a spring and can not apply to a counterweight.

This reading would make the claim the practical equivalent of claim 5—a construction usually to be avoided. Symington Co. v. National Castings Co., 250 U.S. 383, 39 S.Ct. 542, 63 L.Ed. 1045; Smith v. Snow, 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721. I am not able to find the necessity for such a limitation, either to save the patent from the prior art or in the specification or to preserve its essential function. It has not been shown why an absolutely, or even substantially, constant pressure is necessary to accomplish the filling of the cans in the desired manner. All that is necessary is a pressure which is sufficient to eliminate voids. Of course, it must not become so severe as to actually compress the volume of the ice cream and reduce the overrun, but there appears to be no danger of that in the patented structure, and the defendant has not suggested that his device, in which the pressure is not constant, does not operate satisfactorily within these limits.

My conclusions are:

1. Claims 3 and 5 of Patent No. 1,783,864 to Vogt are invalid, being anticipated by Patent No. 1,113,807 to Meisenhelter and the machines made in accordance with it.

2. Claims 3 and 5, if valid, would be infringed by the defendant's process.

3. Claims 18 and 19 of Patent No. 1,783,867 to Vogt are invalid for want of invention over the prior art.

4. Claims 18 and 19, if valid, would not be infringed by the accused freezer.

5. Claims 3 and 4 of Patent No. 1,972,253 to Vogt are invalid for want of invention over the prior art.

6. Claims 3 and 4, if valid, would not be infringed by the accused freezer.

7. Claim 4 of Patent No. 1,881,106 to Vogt and Wymond is valid and infringed by the accused can filler.

8. Claim 5 of Patent No. 1,881,106 to Vogt and Wymond is valid, but not infringed by the accused can filler.

In addition to the foregoing conclusions the statements of fact contained in this opinion may be taken as special findings of fact in compliance with Equity Rule 70½, 28 U.S.C.A. following section 723, and the statements of law as conclusions of law in compliance with the same rule.

A decree may be presented in accordance with the foregoing.